IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

STACEY R. WASHINGTON,

      Plaintiff,

v.                                          Civil Action No. 3:23-cv-00056-RSB-JCH

DOMINION ENERGY SERVICES, INC.

      Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**INTRODUCTION**

This case is a classic example of "no good deed goes unpunished." Plaintiff, Stacey R. Washington ("Washington"), claims that defendant, Dominion Energy Services, Inc. ("Dominion"), discriminated and retaliated against her when, in reality, Dominion gave Washington every chance to succeed in her employment and in its Overhead Line Worker Training Program (the "Program"). While Dominion did hold Washington in Step 5 training, it was because she failed to master the skills required to progress and she missed a significant amount of on-the-job training due to absences. And, even though Washington did not advance in the Program, <u>Dominion kept increasing her pay for the next two years after she was held back</u> as if she had successfully progressed.

In exchange for receiving three unearned pay raises, Washington brought this lawsuit. Though Washington blames her failure to progress on her sex (female) and disability (cancer diagnosis), the fault lies solely with her. Despite having to redo Step 5, Washington got pay raise after pay raise and an open-ended amount of time to complete the Program—opportunities not

given to other employees. She then quit, years after being held back, years after her cancer diagnosis, and years after attempting (unsuccessfully) to complete Step 5.

## STATEMENT OF UNDISPUTED FACTS[1]

1.    Dominion hired Washington in 2015 as a Ground Worker. (ECF No. 7 ¶ 2.)

**I.    The Program**

2.    The Program is comprised of seven steps that occur over approximately five years. (Dep. of Jason Gambill ("Ex. A"), at 8:10-12.) Trainees receive pay raises as they progress through the Program steps. (Decl. of Phebe Elliott ("Ex. B"), at ¶ 3.)

3.    At the end of each step, the trainee's supervisor completes a Field Practice Evaluation ("FPE"). (Ex. A, at 8:15-9:23.) If a trainee receives two or more "needs improvement" scores on a FPE, the trainee automatically fails that step, (Dep. of Jeremy Phelps ("Ex. C"), at 8:24-25), and must repeat it. (Ex. A, at 20:8-12.)

4.    In Step 5, trainees begin "live energized work" known as "gloving," so the Program's second half, from Step 5 on, is "critical" and "a lot more dangerous and [] a lot more complicated than step one, two, and three and four." (Dep. of Joey Sharon ("Ex. D"), at 36:22-37:14, 60:13-20.)

**II.    Washington Inadvertently Began Step 6 Training Though She Did Not Pass Step 5**

5.    Following Washington's Step 5 training in Fall 2019, her supervisor, Chad Mayse, filled out Washington's Step 5 FPE. (Dep. of Chad Mayse ("Ex. E"), at 55:6-58:23; Mayse HR Report ("Ex. F"); Decl. of Ryan Mayse ("Ex. G"), at ¶ 7.) Washington received "needs improvement" scores on the Step 5 FPE. (*Id*.) Unbeknownst to Mayse, due to a computer error, the Step 5 FPE was never submitted. (*Id*.)

---

[1] The Statement of Undisputed Facts shall be referred to as "SUF."

6.    Following the completion of a step, an automatic mass email is sent to all trainees with details for the next step. (Ex. A, at 15:17-16:1; Decl. of Jason Gambill ("Ex. H"), at ¶ 8.)

7.    On September 25, 2019, Senior Instructor Rick Snoddy included Washington on an email reminder about Step 6 training starting on September 30, 2019. (Ex. E, at 45:1-19.) Jason Gambill, Director of DEV Training, explained:

> Q. So in order for [Washington] to get [the September 25, 2019 email], [Washington] had to have been passed [Step 5]; correct?
>
> A. Not necessarily, no.
>
> Q. Why would that not be necessarily true?
>
> A. Because these emails are sent to an entire wave of individuals and can be at times an automated process that an instructor will send out for everybody who is registered for that class.

(Ex. A, at 15:17-16:1.)

8.    From September 11-30, 2019, Washington was absent from work. (Decl. of Tracy Warden ("Ex. I"), at Ex. A.) She testified she was diagnosed with cervical cancer during this period. (Dep. of Stacey Washington ("Ex. J"), at 30:2-16.) Washington was approved for intermittent FMLA leave from September 16-October 2, 2019. (Ex. I, at Ex. A.)

9.    When she returned, on September 30, 2019, Washington attended just two days of a ten day portion of Step 6 classroom training. (Ex. F.) Due to her excessive days missed in that portion, Washington was sent back to her supervisor, Mayse. (*Id.*)

10.    Mayse was then notified the training center had never received Washington's Step 5 FPE. (*Id.*; Ex. G, at ¶¶ 7-8.) Mayse resubmitted the same Step 5 FPE with the "needs improvement" scores, which prevented Washington from advancing to Step 6. (*Id.*)

11.    On October 15, 2019, Snoddy emailed Washington and others the following:

3

> Due to the fact that Stacey was unable to attend her regular TS-6 class[,] [w]e will
> be moving her to the next available class. This is the 2017 LTP wave 2 step 6, class
> and will start February 17th and run until the 27th. If you or her would like her to
> finish with her regular class you will have only 4 months to finish her field practice
> (usually 6 months)[.] Please let us know so we can keep here [sic] schedule up to
> date. Either way we'll see here in February.

(Ex. A, at 18:4-12; Oct. 15, 2019 Email ("Ex. K").)

12.    Dominion regularly "schedule[s trainees] out for the rest of the duration of [their] training, and it is all dependent on [the trainee] passing" his or her current step. (Ex. A, at 20:4-7.) The scheduling out will often occur prior to the trainee actually passing his or her current step on the assumption that the trainee will complete his or her current step on time. (*Id.*)

## III.    Washington's Management Team Decides to Hold Her in Step 5 Due to Poor Performance and Lack of Sufficient On-the-Job Training

13.    Washington was out from December 4-6, 2019 on sick leave with no pay. (Ex. I, at Ex. A.) From January 2-17, 2020 and January 27-February 16, 2020, Washington was on continuous FMLA leave related to her cancer diagnosis. (*Id*.) In fact, from October 15, 2019-February 17, 2020, Washington missed 57 of 88 work days. (*Id*.)

14.    On January 30, 2020, Washington's management team, including Greg Browning, met to discuss Washington's progression in the Program. (Ex. E, at 79:2-8; Jan. 30, 2020 Email ("Ex. L").) During that meeting, the team discussed that Washington would need to be "held in [S]tep 5 due to missing to [sic] much time while in her last training class." (Ex. L.) Because she had missed so much time, Washington was unable to "get her gloving on the job training." (*Id.*) She had also "not written down anything in her training log." (*Id.*)

15.    While she was on leave, Browning called Washington three times to tell her she was being held in Step 5. (Ex. J, at 61:6-14.) Although Washington saw the missed calls, she never called Browning back because she did not "listen to [his] messages." (*Id.*)

16.     On February 17, 2020, Washington returned to work. (Ex. I, at Ex. A.) On the same date, she was called to a fact finding meeting with Browning, Aaron Pace, Ann Powell, and Jeremy Greene to discuss why she failed to return Browning's calls. (Ex. J, at 57:5-20, 62:7-11.) During the meeting, Browning told Washington that she was being held in Step 5 due to the significant amount of on-the-job training she had missed. (*Id.* at 63:12-14.)[2]

## IV.    **Washington Makes Vague Complaints About "Gender Bias"**

17.     Washington testified that Richard Fossum called her "hon" on February 25, 2020, the only time anyone at Dominion ever called her "hon." (*Id.* at 19:17-25, 20:3-10.)

18.     On June 26, 2020, Washington sent an email to Browning, Fossum, Mayse, and Edward Brownfield "thank[ing Browning and Fossum] for bringing up [the] learning mistake that [she] made." (*Id.* at 71:8-17; June 26, 2020 Email ("Ex. M".) She also noted that she had "stated multiple times to [Browning and Fossum] there is an issue in this office of gender bias and a click [sic] atmosphere." (Ex. M.)

19.     On July 1, 2020, Browning responded to Washington as follows:

Our ultimate goal is to see you successfully graduate from the OHLT program. As previously stated, we take every opportunity to coach and mentor all trainees so that mistakes only happen once and everyone goes home safely. We will continue to get you opportunities to perform gloving work so that you may pass all your FPEs and be able to complete your trainee book. Your success and safety are our top priorities.

As for your concern about gender bias – if someone asks a question about your performance, it is intended as an opportunity to help you increase your aptitude for linework . . . . We want to continue to nurture and develop a culture of inclusivity and teamwork.

(Ex. J, at 84:9-18; July 1, 2020 Email ("Ex. N").)

---

[2] Browning's wife died of cervical cancer prior to 2020. (ECF No. 7, at ¶ F.4.) Washington contends (without evidence) that this made him biased towards female cancer patients in the Program. (*Id.*)

20.     On August 28, 2020, Washington made an "anonymous call to the company compliance line to file a report based on gender bias." (Ex. J, at 87:18-88:2; Dec. 3, 2020 Email ("Ex. O").) She did not identify herself by name or as a female trainee in the Program. (Ex. J, at 91:19-92:18.)

21.     On September 11, 2020, Washington contacted the compliance line to check on the response and was told that she "needed to provide examples of the behavior to her or Nicole Baab with Dominion. [Washington] stated that if [she] did that it would identify [her]. [Washington] was not sure [she] wanted to do that and would consider it." (Ex. O).

22.     Washington did not identify herself as the complainant until December 3, 2020, when she contacted Nicole Baab in Human Resources and advised of being held in Step 5. (*Id.*)

23.     On December 7, 2020, Washington emailed Baab: "I appreciate your reassurance that there was no retaliation for me calling the compliance line on August 28 however I do not agree with that." (Ex. J, at 90:20-91:9; Dec. 8, 2020 Email ("Ex. P").) Baab responded: "Let me reassure you again, there was no retaliation for you calling the compliance line. I know this for two reasons A) the allegations were anonymous and B) only the coordinator in Ethics and Compliance and I were involved. Your leadership team was never made aware of any allegations." (Ex. P.) Washington conceded she knows of no facts that support her "conclusion that [her] supervisor knew about this anonymous complaint." (Ex. J, at 94:17-22.)

24.     Her supervisors were unaware of her August 28 complaint. (Ex. G, at ¶ 13.)

25.     To support her claims, Washington testified her mistakes were taken more often to management, one employee would not allow her in the truck with him, and she once was not allowed to climb a pole. (Ex. J, at 28:12-19, 73:10-74:14, 76:17-24, 81:5-82:4.)

## V.    <u>Washington's Poor Job Performance</u>

26.    Through her career at Dominion, Washington responded negatively and aggressively to help from her supervisors. When she would "mess[] up" and her team "tried to help" her, she "got mad." (Ex. E, at 66:11-12.) It was "clear" to Washington's supervisors that she had a "hard time taking responsibility for her own action[s]." (Dep. of Patrick Couch ("Ex. Q"), at 13:1-15; Sept. 10, 2020 Email ("Ex. R").) When Washington was told she was doing something wrong or was given an easier way to do something in training, she "generally yell[ed]" at her supervisors that they should be "[t]raining her." (Ex. R.)

27.    Washington's supervisors gave her "a whole lot more opportunities than [they] gave other people." (Ex. E, at 66:11-20.) Further, her crew believed that she was "not catching on or participating in jobs." (Dep. of Ryan Burtner ("Ex. S"), at 47:19-48:14.) She "would not ask to get in the bucket and would not sit in the bucket and not help." (*Id*.)

28.    Washington's supervisors felt she "lack[ed] a desire to progress and [took] little if any initiative to do so . . . She had every opportunity to climb poles or go up in a bucket and learn how to do the job. Instead, she wait[ed] until another apprentice steps up to do the job." (Ex. R.) Specifically, Washington had a "serious issue" with mechanical aptitude, which could "eventually get herself or someone else injured or worse." (*Id*.) Washington had to be retaught "simple tasks" "several times" and was "unable to use methods that she ha[d] learned to plan a job and execute it safely." (*Id*.)

29.    Washington acknowledged that, "of course" she made mistakes in training, and in fact, some were "safety-related." (Ex. J, at 28:25-29:6.) She also did not dispute any of her FPEs. (*Id.* at 46:15-55:17.)

## VI.    **Washington Fails Step 5 Because of Her Poor Performance**

30.    On her September 2020 Step 5 FPE, Washington received three "Needs Improvement" scores, which resulted in an "unsatisfactory" final score. (Ex. J, at 51:4-11; Step 5 FPE ("Ex. T").) Specific comments were as follows:

> [S]ometimes Stacey questions how to set her bucket up in order to work without having to set bucket up a second time . . . . Stacy struggles knowing the proper procedure in hanging the cross arm in an energized condition without the guidance from a lineman and/or supervisor . . . . Stacey struggles a lot with understanding the different knots.

(Ex. T.)

31.    On Thursday, September 17, 2020 (the "September 17 Meeting"), Dominion provided Washington with a Failure Notice for Step 5. (Ex. J, at 85:16-86:11; Failure Notice ("Ex. U".) When given the options to complete "remediation and reevaluation" of Step 5 or to withdraw from the Program, Washington chose to stay in Step 5. (Ex. U; Ex. J, at 87:7-13.)[3]

32.    Washington shredded her Dominion training book immediately following the September 17 Meeting. (Ex. J, at 95:21-23.) An investigation revealed that Washington's "trainee book had been shredded [and] placed in a bag and displayed in the slot where [her] book [was] to be kept." (*Id.* at 95:2-13; Employment Decision Day ("Ex. V").)

33.    That following Monday, September 19, 2020, Washington took leave for an off-the-job injury (unrelated to her cancer diagnosis the year prior)[4]; she did not return to work until February 1, 2021, approximately four and a half months later. (Ex. I, at Ex. A.)

---

[3] Washington pursued a union grievance related to her Step 5 failure, which is now complete. (Ex. S, at 18:7-9, 23:25-24:12.)

[4] Five of the days Washington was absent for during this period were approved as FMLA with no pay. (Ex. I, at Ex. A.)

34.     When she returned on February 2, 2021, Washington attended an Employment Decision Day[5] meeting because she shredded the training book. (Ex. J, at 95:2-13.) The Employment Decision Day was delayed due to Washington's leave. In the Employment Decision Day Action Plan, Washington wrote that she "will strive to improve [her] communication style to better align with a 'positive work environment' and to behave in a professional manner." (Ex. V.)

35.     Washington continued in Step 5 training until she quit in September 2021. (ECF No. 7, at ¶ 3; Ex. J, at 14:17-24.)

**VII.    <u>Despite Not Passing Step 5, Dominion Still Paid Washington As If She Had</u>**

36.     Despite never progressing past Step 5 training, Dominion continued to pay Washington as if she had passed that training step and successfully completed three more training steps. (Ex. B, at ¶ 4.) When she resigned in September 2021—just two years shy of her leave for cancer treatments—Washington was being paid at a Step 8 training level, despite not having completed Step 5. (*Id.*)

**PROCEDURAL BACKGROUND**

Washington filed a Charge of Discrimination with the Equal Employment Opportunity Commission on January 22, 2021 while still employed by Dominion. (ECF No. 2, at 2.) The EEOC dismissed her Charge, without finding cause for discrimination, on July 28, 2023. (*Id.*)

Washington filed her Complaint on October 25, 2023, alleging that she was harassed and discriminated against on the basis of her disability and that she was retaliated against for making an internal complaint to Human Resources. (ECF No. 2, at 6.) Dominion filed its Answer on November 28, 2023. (ECF No. 7.) Washington then filed a "Response" to Dominion's Answer on December 5, 2023. (ECF No. 9.) Dominion filed a Motion for Judgment on the Pleadings ("Rule

---

[5] The Employment Decision Day is the day that serves as the last step in the disciplinary process before termination, which allows the employee an opportunity to develop an action plan to improve behavior or performance. (Ex. V.)

12(c)(6) Motion") on March 7, 2024. (ECF No. 18.) Though the Court heard arguments on the

Rule 12(c)(6) Motion on May 6, 2024, it has not yet rendered a decision. (ECF No. 23.)

**LEGAL ARGUMENT**

## I.    <u>Washington Does Not Plead Any Claims Related to Her Sex</u>

During Washington's deposition, she focused on what she perceived as harassment and

discrimination on the basis of her sex. But, Washington never pled any sex-related claims. She

fails to mention sex anywhere in her Complaint (ECF No. 2.) On her Civil Cover Sheet, she

characterized her claims, in her own words, as "Disability Discrimination and Retaliation for

Protected Activity." (ECF No. 2, attach. 2.) Further, Washington did not dispute Dominion's

characterization of her claims in its Rule 12(c) Motion as based solely on disability. (ECF No. 18,

20.) *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (in construing *pro se*

complaints, district courts are not required to "conjure up questions never squarely presented to

them"); *Clark v. Payne*, CA No. 3:20-cv-00017, 2024 WL 1092545, at *5 (W.D. Va. Mar. 13,

2024) (explaining a pleading may only be amended "with the opposing party's written consent or

the court's leave" per Rule 15(a)(2)). However, to the extent this Court disagrees and allows

Washington to proceed on sex-based claims, Dominion will address the substance of any alleged

sex claims.

## II.    <u>Standard of Review Under Rule 56 of the Federal Rules of Civil Procedure</u>

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A fact is 'material' if proof of its existence or non-existence would affect disposition

of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is

such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp.*

*Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (internal citation omitted). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must point to specific facts—not "mere allegations or denials"—showing that a dispute of material fact exists. *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

### III.   *McDonnell Douglas* **Burden Shifting Framework**

Washington has no direct evidence linking Dominion's actions to unlawful discrimination or retaliation. *See*, *e.g.*, *Melendez v. Bd. of Educ. For Montgomery Cnty.*, 711 F. App'x 685, 687 (4th Cir. 2017) (direct evidence of discrimination includes "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision") (citation omitted). Accordingly, if she is to prove her claims, it must be pursuant to the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Washington must first establish a *prima facie* case by proving a set of elements, which differ according to the claim. If she can demonstrate a *prima facie* case, the burden then shifts to Dominion to articulate legitimate, non-discriminatory and non-retaliatory reasons for its actions. *Id.* at 802. Then, the burden shifts back to Washington to prove that Dominion's explanation was merely a pretext and that discrimination or retaliation was the employer's true motive.

### IV.   **Summary of the Argument**

Washington alleges that she suffered disparate treatment—being held in Step 5, having her mistakes taken to management, and not being allowed in the bucket or on a pole—and a hostile work environment on the basis of her sex and disability. She also alleges Dominion retaliated against her for complaining about alleged "gender bias."

Fatal to her claims is the fact that Washington cannot prove *prima facie* cases under those theories. For purposes of her discrimination and harassment claims, she does not demonstrate that

she suffered any adverse action, does not point to any comparators that were treated better than her, and does not show she suffered any severe or pervasive conduct. For her retaliation claim, Washington cannot demonstrate any causal connection between being held in Step 5 and her complaint because the decision to hold her back was made *before* her complaints. Moreover, one of her complaints was anonymous and her supervisors had no knowledge of them.

Even assuming *arguendo* that Washington could demonstrate a *prima facie* case of discrimination or retaliation, Dominion has articulated legitimate, non-discriminatory and non-retaliatory reasons why she did not progress to Step 6: 1) her lack of demonstrated skills to pass Step 5; and 2) her lack of sufficient on-the-job training. Finally, Washington cannot prove pretext based on the undisputed facts here. Accordingly, summary judgment should be entered in Dominion's favor.

## V.     Washington Cannot Prove a *Prima Facie* Case on Any of Her Claims

### A.     Washington Cannot Establish *Prima Facie* Claims for Disparate Treatment

Washington claims she suffered disparate treatment because of her sex and disability. Specifically, she alleges she was held in Step 5 of the Program, her mistakes were taken more often to management, one employee would not allow her in the truck with him, and she once was not allowed to climb a pole. (SUF 25.) To prove a *prima facie* case of disparate treatment based on sex under Title VII, Washington must show: (1) she is a member of a protected class; (2) she has satisfactory job performance; (3) she was subjected to adverse employment action; and (4) similarly situated employees outside her class received more favorable treatment. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2005)), *aff'd*, 566 U.S. 30 (2012). As a woman, Washington is a member of a protected class under Title VII. However, she fails to meet the other three requirements.

Similarly, to establish a claim for disparate treatment under the Americans with Disabilities Act (ADA), Washington must prove that "(1) that she is within the ADA's protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse action, she was performing her job at a level that met her employer's legitimate expectations; and (4) that the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Christmas v. Arc of the Piedmont*, C.A. No. 3:12CV00008, 2013 WL 718812, at *5 (W.D. Va. Feb. 27, 2013) (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). Specifically, she must show that "her disability or perceived disability 'actually motivated the employer's decision.'" *Sturgill v. Norfolk S. Ry. Co.*, 391 F. Supp. 3d 598, 608 (E.D. Va. 2019) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (internal citation omitted)). Washington has a disability,[6] as she was diagnosed with cancer in October 2019. (SUF 8.) However, she fails to meet the remaining elements.

### 1.    Washington's Job Performance was Unsatisfactory

When considering this element, "the employer's performance expectations . . . are the relevant inquiry" <u>not</u> Washington's "subjective beliefs regarding the adequacy of h[er] job performance." *Luther v. Gutierrez*, 618 F. Supp. 2d 483, 492 (E.D. Va. 2009) (citing *Evans v. Techs. Applications & Serv. Co.*, 90 F. 3d 954, 960-61 (4th Cir. 1996) (emphasis omitted)) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff").

The undisputed facts demonstrate that Washington was *not* performing to Dominion's standards: Washington admitted that she received two "needs improvement" scores on her Step 5 September 2020 evaluation, she admitted to missing a significant amount of on-the-job training from Fall 2019 to 2021, and Washington admitted she did not adequately fill out her training book

---

[6] Dominion assumes for purposes of this Motion only that Washington's cancer diagnosis and treatment qualified as a disability under the ADA.

to demonstrate she had mastered the skills necessary to progress (in fact, she ultimately shredded the book). (SUF 29, 32.) *See, e.g.*, *Randa v. Garland*, 855 F. App'x 874 (4th Cir. 2021) (affirming summary judgment to the employer on pregnancy discrimination and retaliation claims where the plaintiff failed to show she was meeting her employer's legitimate performance expectations when she was terminated three months after receiving an evaluation that included several serious criticisms); *Strothers v. City of Laurel, Md.*, 118 F. Supp. 3d 852, 853 (D. Md. 2015) (holding that plaintiff was not meeting her "employer's legitimate expectations" because, among other facts, the plaintiff received "an evaluation rating her 'unsatisfactory' in every category").

### 2.    *Washington Suffered No Adverse Employment Action*

The only adverse action Washington identifies in her Complaint is Dominion's decision to keep her in Step 5 training and not progress her in the Program. (ECF No. 2, at 2.) In her deposition, Washington testified that her mistakes were reported to management, statements about her errors in training were noted in her "employee working file," one employee did not let her go into the bucket with him, and a man once climbed a pole instead of her. (SUF 25.) None of these amount to adverse employment actions.

"[T]he denial of the opportunity to attend training" is "generally" <u>not</u> an adverse employment action for purposes of a discrimination claim unless the denied training had a "detrimental effect on [the] employment status." *Claiborne v. Youngman*, No. 3:19-cv-113, 2020 WL 7246591, at *3 (E.D. Va. Dec. 9, 2020), *Muhammad v. Westinghouse Elec. Co., LLC*, No. 3:12-cv-3298, 2013 WL 5469982, at *12 (D.S.C. Sept. 30, 2013) ("It is clear that Plaintiff was dissatisfied with her lack of training, but that fact alone does not constitute adverse employment action."). The undisputed facts demonstrate that Washington was treated <u>exactly the same</u> as if she

14

had completed Step 5 training; Dominion kept increasing her pay so that when she quit, she was being paid at a Step 8 level, as opposed to Step 5. (SUF 36.)

As such, Washington fails to show that she suffered an adverse action when she was held in Step 5 because the "terms, conditions, and benefits" of her employment remained the same, and in fact, <u>improved</u> despite not progressing past Step 5. *Claiborne*, 2020 WL 7246591, at *3 (finding no adverse action where plaintiff was not disciplined or penalized for not completing the training); *Bunch v. Caldera*, No. 00-cv-1142, 2001 WL 34366089, at *5 (E.D. Va. Jan. 16, 2001) (finding no adverse action when "Plaintiff has not shown that the denial of training changed her existing working conditions"), *aff'd*, 15 F. App'x 43 (4th Cir. 2001). In the same way, even if Washington's mistakes were taken to management and if she did not get to go into a bucket or climb a pole, these were not detrimental to the terms, conditions, and benefits of her employment, because she continued to receive the same training and pay. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (holding, where plaintiff retained his same position, pay, and benefits, "an employee's dissatisfaction with this or that aspect of work does not mean an employee has committed an actionable adverse action").

During the hearing on Dominion's Rule 12(c)(6) Motion, this Court questioned whether the Supreme Court of the United States's recent decision in *Muldrow* impacted this analysis. It does not. Washington suffered no harm in remaining in Step 5. *See Muldrow v. City of St. Louis*, 144 S. Ct. 967, 977 (2024) (holding that, for a Title VII sex discrimination claim, an employee "need show only some injury respecting her employment terms or conditions. The transfer must have left her worse off, but need not have left her significantly so.") Washington was not left "worse off"—she remained in the <u>same</u> step of the Program and received a pay increase. *See id.* at

15

972, 977 (finding employee's transfer resulting in a less desirable schedule and loss of the use of a take-home car, "left [her] worse off several times over) (internal citations omitted).

Washington cannot identify any tangible detriments to her employment. Washington alleges being required to redo Step 5 prevented her from "bid[ding] on a union career progression position to a Serviceman position" which she would have been able to do "[a]fter attending Step 6." (ECF No. 20, at 4.) However, this presupposes that Washington would have successfully completed Steps 5 and 6, applied to the lateral Serviceman position, and then be selected for the Serviceman position. (*Id.*) In fact, Washington quit before she ever progressed past Step 5, after working in Step 5 training for nearly two years. (SUF 35.) She was never qualified to bid on the position when she was held in Step 5, meaning Dominion's holding of Washington in Step 5 did not leave her worse off by preventing her from obtaining a Serviceman position.

In sum, Dominion's "denial of training opportunities" does not "me[et] the definition" of an adverse employment action because Washington's role remained the same and her pay was increased as if she had progressed in training. *Michael v. Va. Commonwealth Univ.*, No. 3:18-cv-125, 2018 WL 3631888, at *2 (E.D. Va. July 31, 2018) (granting motion to dismiss and dismissing race discrimination claim for failure to plead an adverse employment action).

### 3.    *Washington Cannot Identify a Comparator*

As to the last element of her disparate treatment claim, Washington cannot identify a male or non-disabled overhead line worker who received more favorable treatment than her. This is because Washington received *more* favorable treatment than her co-workers. (SUF 27.) Specifically, Washington has not alleged, and there is no evidence of, any Dominion employees passing a step in the Program where they received two or more "needs improvement" scores. (SUF 3.) Rather, it is undisputed that Washington was actually treated <u>better</u> than the male line workers,

because she was given so many opportunities to succeed in the program. (SUF 27; Ex. F.) ("Several men have failed out of the program, it is a tough program, and everyone does not make it through . . . . [Washington] has been given lots of leeway that a male in her position would have never received.").) Washington testified that her mistakes were brought to the attention of management more frequently than her male counterparts. (SUF 25.) Yet, Washington admitted that, "of course she made mistakes in training, and in fact, some were "safety-related." (SUF 29.) Accordingly, Washington is unable to establish that similarly situated employees outside her classes received more favorable treatment.

### B.    Washington Cannot Prove *Prima Facie* Hostile Work Environment Claims

For Washington to establish a *prima facie* claim of hostile work environment based on her sex or disability, she must prove that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some basis exists to impute liability for the harassment to Dominion. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (citing factors for Title VII claim); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (citing factors for ADA claim). Washington must show that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Whether allegedly harassing or discriminatory conduct is legally severe or pervasive enough to alter the condition of employment and create an abusive work environment is assessed in view of the totality of circumstances, including (1) frequency of the conduct, (2) severity of the conduct, (3) whether the conduct was physically threatening or humiliating, or merely offensive,

and (4) whether the conduct unreasonably interfered with an employee's work performance. *Id*. at 23. Additionally, Washington must show that her work environment was both objectively and subjectively offensive, i.e. that a reasonable person would find the environment hostile or abusive, and that she in fact did perceive it to be so. *Moss v. Saja Rest. Grp., LLC*, 670 F. Supp. 3d 349, 361 (W.D. Va. 2023).

In her deposition, Washington provided no explanation of why she endured a hostile work environment based on her disability. (*See generally* Ex. J.) Her Complaint only makes conclusions, but provides no factual examples. (ECF No. 2.) As to sex, Washington alleges her colleagues were "intimidated by a woman being in the workforce" because "there's not very many women in the workforce that are in the field, and there's very much an egotistical, machoistic vibe." (Ex. J, at 67:21-68:8.) The *only* specific instance Washington recalls of unwanted comments related to her sex is Fossum calling her "hon" once on February 25, 2020. (*Id.* at 19:17-25.) She also took issue with respect to the fact that her supervisor, Couch, would not go into the bucket with her alone at night, which Couch explained was a "religious" matter for him. (SUF 25; Ex. Q, at 16:21-17:5.) These allegations do not amount to severe or pervasive conduct sufficient to alter the condition of Washington's employment. Comparatively, even in cases where the conduct alleged was blatantly sexist or ableist, courts have found it NOT to be objectively, legally severe or pervasive:

- Supervisor touched plaintiff's buttocks and thigh, tried to kiss her, called her beautiful, and asked her to accompany him on a weekend trip. *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97-99 (D.D.C. 2007).

- Co-worker caressed plaintiff on his knee, placed her breast on his arm, and placed her fingers on his buttocks. *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004).

- Co-workers called plaintiff a "f—ing bitch" and "just a useless bitch" numerous times, including while she was on medical leave, and moved her picture from a list of air traffic controllers to pictures of secretaries. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009).

- Co-worker said plaintiff, who had severe anxiety and depression, "would have been a 'risk' [] in his old position because he could have had 'a heart attack or stroke,'" said plaintiff had "gone 'crazy'" and "his return was going to be a 'train wreck' and 'need[ed] to stop before it even [got] started." *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 369 (4th Cir. 2022).

Washington testified that "[t]he fact of doing [her] job and every learning mistake that [she] take[s] is taken to management and used against [her] [] creates a hostile working environment." (SUF 25; Ex. J, at 27:9-15.) However, "requiring [a] plaintiff to perform work assignments within her job duties cannot constitute a hostile work environment." *Tomasello v. Fairfax Cnty.*, Case No. 1:15-cv-95, 2016 WL 165708, at *22 (E.D. Va. Jan. 13, 2016). Dominion addresses all trainees' learning mistakes, which is why it evaluates trainees with FPEs at each step. (SUF 3, 19.) Washington cannot maintain her claim of a hostile work environment solely because she had to perform her job and be evaluated on mistakes she made on the job.

### C.   Washington Cannot Prove a *Prima Facie* Retaliation Claim

Title VII's opposition clause prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employees] ha[ve] opposed any practice made an unlawful employment practice by under Title VII." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Washington must show that she: (1) engaged in a protected activity; (2) her employer acted adversely against her; and (3) the protected activity and the adverse action were causally connected. *Maron v. Va. Polytechnic Inst. & State Univ.*, 508 F. App'x 226, 230 (4th Cir. 2013). "[T]he crux of a successful retaliation claim is that the plaintiff engaged in activity protected by law, and then, because of this, the defendant took an adverse employment action against him." *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023) (under the ADA); *see also Powell v. Biscuitville Inc.*, Case No. 6:19-cv-80, 2020 WL 7054241, at *3 (W.D. Va. Dec. 2, 2020) (under Title VII). Washington fails to establish a *prima facie* case of retaliation, as she fails to meet any of its elements.

1.     *There is No Causal Connection*

Washington can never prove a causal connection between her complaints and Dominion's decision to hold her in Step 5, because (1) she made no complaints before she was first held in Step 5; (2) there is not sufficient temporal proximity between her June 2020 email to her supervisors and September 2020 failure; and (3) her September 2020 failure followed only an anonymous complaint of which none of her supervisors had knowledge.

Washington does not allege that she engaged in any protected activity prior to February 17, 2020, which was the first time she was held in Step 5. (SUF 16.) Thus, the decision to hold her back could not possibly have been retaliatory. *See Francisco v. Verizon South, Inc.*, 442 F. App'x 752, 754 (4th Cir. 2011) (to demonstrate causal connection, "a plaintiff must generally show at the very least that the [retaliation] occurred <u>after</u> the decision-making authority became aware of the employee's grievance") (citing *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)) (emphasis added).

Washington alleges she engaged in protected activity when: (1) she sent an email to her management in June 2020 alleging "gender bias and a click [sic] atmosphere"; (2) she made an anonymous complaint to Dominion's Human Resources department in August 2020 about "gender bias"; and (3) she identified herself as the anonymous complainant and offered details of her complaint in December 2020. (SUF 18, 20, 22.) The three month span between Washington's June email and September Step 5 failure is fatal to demonstrating causal connection. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (a two month temporal gap is "sufficiently long so as to weaken significantly the inference of causation between the two events") (citing *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 153 (4th Cir. 2017) ("temporal proximity cannot provide proof of causation unless

the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close'") (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 368, 273 (2001) (emphasis omitted)).

As to the August 2020 anonymous complaint, Washington did not identify herself as the complainant until nearly three months *after* she was failed in Step 5. She was notified of her Step 5 field failure in September 2020 but did not identify herself to Dominion's Human Resources team as the anonymous complainant until December 2020. (SUF 22, 31.) Lastly, none of the individuals responsible for holding Washington in Step 5 even knew about her complaint.

"As [we have] held, no causal connection can exist between an employee's protected activity and an employer's adverse action *if the employer was unaware of the activity*. An employer is aware of an employee's protected activity when he learns of an employee action that he understood or should have understood to be opposition against a Title VII violation." *Randa v. Garland*, 855 F. App'x at 877 (emphasis added) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018)) (internal citation omitted); *Roberts v. Glenn Indus. Group, Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) ("To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred."). Here, it is undisputed that none of Washington's management and those responsible for her failing Step 5 in September 2020 had knowledge of Washington's anonymous complaint. (SUF 24.) Thus, there can be no connection between the two sufficient to prove retaliation.

2. *Washington Did Not Engage in a Protected Activity Until December 2020*

An employee engages in protected activity when she opposes actions that are 'actually unlawful' . . . or that she "reasonably believes to be unlawful' . . . ." *Dufort v. Liberty Univ.*, Case

No. 6:21-cv-00054, 2023 WL 137496, at *5 (W.D. Va. Jan. 9, 2023). Washington cannot maintain

a claim of retaliation based on "general complaints of unfair treatment." *Lambert v. Sheetz, Inc.*,

C.A. No. 5:13-cv-00096, 2015 WL 1477781, at *3 (W.D. Va. Mar. 31, 2015).

   Prior to failing Step 5 in September 2020, Washington only made general complaints of

gender bias. (SUF 18, 20.) In fact, as to her anonymous complaint in August 2020, Dominion

specifically asked Washington to "provide examples of the behavior" of which she was

complaining. (SUF 21.) She failed to do so until December 3, 2020. (SUF 22.) Washington only

mentioned "gender bias" in her anonymous complaint and never identified herself as a woman or

as disabled. (SUF 20.) Washington's failure to identify her sex or disability in her complaint is

fatal to her retaliation claim. *Phillips v. Loudon Cnty. Pub. Schs.*, No. 1:19-cv-501, 2020 WL

2205065, at *2 n. 6 (E.D. Va. May 6, 2020) (holding that the plaintiff failed to engage in protected

activity when he only "complained about his performance evaluation without mentioning any

discrimination"); *Parker v. Ciena Corp.*, 787 F. App'x 817, 820 (4th Cir. 2019) (affirming

dismissal of retaliation claim because plaintiff complained about "general workplace grievances"

and "did not allege discrimination").

   Regarding her June 2020 email and August 2020 anonymous complaint, the fact that

Washington made, and Dominion acknowledged, a report about gender bias in the workplace is

insufficient in and of itself to be a protected activity. *See Williams v. Ocean Beach Club, LLC*,

Civil No. 2:11cv639, 2012 WL 4461289, at *5 (E.D. Va. Sept. 25, 2012) ("[C]ourts routinely find

no protected activity even when internal reports lead to intensive internal scrutiny"). Because

Washington's generalized complaints lacked any facts or details and could not reasonably be

believed to oppose a Title VII, they do not constitute protected activity.

3.    *There is No Materially Adverse Employment Action*

To prove a materially adverse employment action for retaliation, a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal quotations omitted) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citation omitted)). This is a lower bar than what is required to prove an adverse employment action for discrimination. *Laurent-Workman,* 54 F.4th at 216.

Here, the challenged action of which Washington complains is being held in Step 5. Being held in a step of training, while receiving a pay increase as if she had progressed in training, is not materially adverse, because a reasonable worker would not be dissuaded from making a discrimination charge if the worker knew he or she would be held in a step and still receive a pay raise for doing so. *See Israelitt v. Enter Servs. LLC*, 78 F.4th 647, 655 (4th Cir. 2023) (holding removing employee from daily team calls and excluding employee from two conferences was not "adverse enough to qualify as unlawful retaliation"); *Koenig v. McHugh*, No. 3:11-cv-60, 2012 WL 1021849, at *5 (W.D. Va. Mar. 26, 2012) (holding a reprimand is not a materially adverse employment action if it does not have collateral consequences such as resulting in termination, demotion, or decrease in pay). Further, Washington obviously was not deterred from making a complaint, because she made an additional complaint *after* she failed Step 5. (SUF 22.)

VI.    **Dominion Can Proffer Legitimate, Non-Discriminatory, and Non-Retaliatory Explanations**

At bottom, Washington's case fails because she cannot prove a *prima facie* case for disability or sex discrimination or retaliation. However, even assuming *arguendo* that she could, Dominion has proffered legitimate, non-discriminatory and non-retaliatory explanations for

holding Washington back in Step 5: her repeated errors in training, her lack of demonstrated skills necessary for passing Step 5, and her lack of sufficient on-the-job training. (SUF 13, 26-29.) Washington, herself, failed to record her required training in her training book. (SUF 14.) Dominion's decision to hold Washington in Step 5 had nothing to do with her sex or disability. Instead, it was a result of Washington's own failure to demonstrate that she had the skills and aptitude necessary to progress to Step 6.

## VII.  <u>Washington Cannot Establish Pretext</u>

Because Dominion has proffered legitimate, non-discriminatory and non-retaliatory explanations for not progressing Washington to Step 6, the burden then shifts back to Washington to establish that Dominion's proffered explanations are merely a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802. In determining whether a plaintiff has established pretext, "[i]t is not . . . the function of this court to second guess the wisdom of business decisions." *Fields v. Verizon Servs. Corp.*, 493 F. App'x 371, 378 (4th Cir. 2012) (quoting *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992)). The court's role is not to "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id*. at 378 (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Instead, the key issue is whether there is an "unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995)).

When asked why she believed she was held in Step 5 because she was a woman, Washington said "it's a possibility to have a feeling" and that she "d[i]dn't recall" "any factual basis for [her] feeling." (Ex. J, at 64:7-18.) However, Washington's personal opinion as to why

she failed to progress in the Program is insufficient to demonstrate that Dominion's decision was a pretext for discrimination or retaliation. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (stating that "no court sits to arbitrate mere differences of opinion between employees and their supervisors") (footnote omitted); *Johnson v. Quin Rivers Agency for Cmty. Action, Inc.*, 140 F. Supp. 2d 657, 666 (E.D. Va. 2001) (holding that although plaintiff disagreed as to whether her transfer was based on legitimate reasons, plaintiff offered no evidence of pretext), *aff'd,* 33 F. App'x 88 (4th Cir. 2002). Further, Washington cannot establish pretext simply because the demographics at Dominion are such (due to the limited number of female Line Workers) that Washington believes her sex is to blame. *See Holleman v. Colonial Heights Sch. Bd.,* 854 F. Supp. 2d 344, 351 (E.D. Va. 2012) (granting summary judgment for the employer and holding plaintiffs did not establish that the supervisor treated women "that way *because of* their gender" just because the evidence showed that only women registered complaints.)

Washington cannot establish pretext. What's more, significantly, Dominion continued to give Washington pay raises as if she had proceeded past Step 5 despite her failure to do so. Such actions by Dominion plainly demonstrate that it was not using Washington's poor performance as a pretext for discrimination or retaliation. Dominion tried to give Washington every opportunity to succeed, despite her poor performance, and without any reference to her sex or disability. Accordingly, even if Washington could establish a *prima facie* case (which she cannot), summary judgment in favor of Dominion is warranted.

## CONCLUSION

There is no evidence that Dominion's decision to keep Washington in Step 5 was motivated by disability or sex animus or by retaliation. Dominion respectfully requests that the Court enter summary judgment in its favor and dismiss Washington's entire Complaint with prejudice.

**Dated**: August 7, 2024          Respectfully submitted,

**DOMINION ENERGY SERVICES, INC.**

By:  */s/ Neil S. Talegaonkar*
Neil S. Talegaonkar (VSB No. 44589)
Catrina C. Waltz (VSB No. 98446)
Kaufman & Canoles, P.C.
1021 East Cary Street, Suite 1400
Richmond, Virginia 23219
Telephone: (804) 771-5700
Facsimile: (888) 360-9092
nstalegaonkar@kaufcan.com
ccwaltz@kaufcan.com

*Counsel for Dominion Energy Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August 2024, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, and I hereby certify that I will mail this

document by U.S. mail to the following non-filing user with courtesy copy via electronic mail:

Stacey R. Washington
142 Berry Mountain Lane
Madison, VA 22727
threesmyluv@yahoo.com

By:  */s/ Neil S. Talegaonkar*
Neil S. Talegaonkar (VSB No. 44589)
Kaufman & Canoles, P.C.
1021 East Cary Street, Suite 1400
Richmond, Virginia 23219
Telephone: (804) 771-5700
Facsimile: (888) 360-9092
nstalegaonkar@kaufcan.com
*Counsel for Dominion Energy Services, Inc.*

22693502v9